MICHAEL SUDZUS, Plaintiff-Appellant, v. THE DEPARTMENT OF EMPLOYMENT SECURITY *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—08—2255

Opinion filed July 24, 2009.—Rehearing denied September 4, 2009.

Lonny Ben Ogus, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Rachel Murphy, Assistant Attorney General, of counsel), for appellees.

JUSTICE TOOMIN delivered the opinion of the court:

In this appeal, we confront the question of whether a nonattorney's representation of an employer at an unemployment benefits hearing constitutes the unauthorized practice of law. Plaintiff, Michael A. Sudzus, appeals from the circuit court's judgment affirming the decision of the Board of Review of the Illinois Department of Employment Security, which denied Sudzus' claim for unemployment compensation benefits. On appeal, Sudzus asserts that (1) his former employer, Butterfield Electric, Inc. (Butterfield), engaged in the unauthorized practice of law by participating in the referee's hearing; (2) the hearing did not provide Sudzus with a full and fair opportunity to present his case; and (3) the Board erred in its determination that Sudzus committed disqualifying statutory misconduct. For the following reasons, we affirm the judgment of the circuit court.

## BACKGROUND

Sudzus was employed as an apprentice electrician at Butterfield, from December 2005 through September 2007. His termination stemmed from the dismantling and theft of heating, ventilation, and air conditioning (HVAC) units on the roof of Butterfield's customer, Industrial Kinetics. On September 24, Sudzus returned from a week-long vacation and received a voice message from Butterfield's owner, Larry Austin, stating that Sudzus should not return to work but should instead contact him.

On September 30, 2007, Sudzus filed a claim for unemployment benefits with the Illinois Department of Employment Security (IDES) wherein he stated the reason for separation was lack of work. In response to Butterfield's protest, the claims adjudicator determined that Sudzus was discharged because of misconduct relating to the air conditioning units and was therefore not eligible for benefits. In turn, Sudzus sought further review by the IDES appeals division.

On December 3, 2007, a telephonic hearing was conducted by a hearing officer who received testimony and relevant exhibits. At the hearing, the referee took statements from Larry Austin, Bob Manley, the superintendent of Five Star Mechanical, Tony Crocilla, Sudzus' supervisor, and Sudzus.

Larry Austin testified that his company was hired by Industrial Kinetics to disconnect the electrical service from 11 rooftop HVAC units. Although those units were to be removed entirely, two additional units were to remain intact to continue servicing offices. Because a

separate contractor, Five Star Mechanical, was hired to physically remove the units, there was no reason for Butterfield electricians to be on the roof. Nevertheless, according to Austin, Bob Manley confronted Sudzus dismantling HVAC units on the roof. Once dismantled, copper parts from the units could be sold.

Austin acknowledged that he had not contacted the police and was not aware of anyone at Industrial Kinetics doing so. Efforts were made to resolve this issue with the customer and it was Austin's understanding that Butterfield would be paying for the damage done to the "totally dismantled" units. At the time of the hearing, Butterfield had not paid for any repairs but "the customer ball parked it around $8,000." At the conclusion of Austin's testimony, Sudzus declined the opportunity to ask questions.

Bob Manley confirmed that he discovered Sudzus dismantling a rooftop HVAC unit. Manley testified that his company, Five Star Mechanical, had been hired to remove the rooftop units and dispose of them. Manley told Sudzus that two of the units were to remain intact, but that the remaining ones could be dismantled. Although Manley did not see Sudzus specifically remove parts from the two units which were to remain intact, he later discovered that they were entirely dismantled. Again, Sudzus had no questions at the end of Manley's testimony.

Sudzus' supervisor, Tony Crocilla, testified that there was no reason for a Butterfield electrician to be on the roof at the time Sudzus was found there or, for that matter, at any time. At the end of Crocilla's testimony, Sudzus attempted to question him but was unable to form a coherent question. The referee then asked Crocilla a clarifying question, but Austin interjected, testifying that on an earlier project Butterfield electricians had worked on the rooftop but that job did not involve any dismantling. Sudzus offered that this was not an answer to his question and then began his own testimony.

Sudzus confirmed that he did indeed dismantle and remove parts from some of the rooftop HVAC units. However, Sudzus testified that Crocilla informed him that all of the units were garbage and that parts could be removed. Sudzus also testified that others participated in removing parts from the units. Although he reiterated that he "was told everything on the roof was junk," he nonetheless acknowledged that Manley had approached him about not dismantling two of the units. While Sudzus was unsure which two units were to remain intact, he made no effort to ask Manley their identity. Sudzus clarified that all the units were dismantled but denied seeing anybody else on the roof. Although Sudzus again admitted removing parts from two or three of the units, he was unable to identify the particular units.

In response to the referee's inquiry of whether he had anything further to state, Sudzus noted that he had never been informed of when he was actually fired. Sudzus then referenced materials he purportedly had faxed to the referee that morning. Because Sudzus sent them to the wrong number the referee had not received them and asked Sudzus to explain the content of those documents. Following Sudzus' testimony concerning the time line of his firing, the referee allowed Austin to question him.

In turn, the referee put additional questions to Austin, Crocilla, and Sudzus, and also allowed them to ask questions of each other. Austin and Crocilla again stated that Butterfield electricians were not to touch any of the rooftop units because their only assignment was to disconnect the units from inside the building. Sudzus repeated that Crocilla informed him it was permissible to dismantle units and take parts home. Sudzus reiterated that numerous other people, including Crocilla, removed parts from HVAC units. Crocilla denied that he had removed parts from the units but conceded that part of the earlier job was to disconnect and remove the pipes and wires attached to the units.

The referee's decision affirming the claim adjudicator's rejection of benefits was mailed the next day. Among her findings of fact, the referee observed:

> "Claimant was aware that eleven of the units were to be junked. However, two of the units were supposed to remain intact because the client planned to use them again. Claimant went to the roof during time when [he] was supposed to be working inside with his crew. He took copper and other parts from some or all of the units. In so doing, he disabled the two units the client planned to keep. His employer had to take financial responsibility for that damage."

The referee found Crocilla's explanation of Sudzus' actual duties on the jobsite and Manley's account of finding Sudzus on the roof dismantling units to be credible. She therefore determined that "the evidence supports a conclusion that it was in fact claimant [Sudzus] who took the parts, apparently to be sold for their value as scrap" and that he was discharged for misconduct. Accordingly, Sudzus was disqualified for unemployment compensation benefits.

Sudzus appealed the referee's decision to the Board, which in turn affirmed the findings and conclusions of the referee. In so doing, the Board stated, the "actions of the claimant placed the employer at risk of a lawsuit from the client." The Board rejected Sudzus' claims that at the telephonic hearing: (1) Butterfield Electric engaged in the unauthorized practice of law; (2) Sudzus did not have the full opportunity to present his case; (3) all of the employer's testimony was

hearsay; and (4) "the decision was incorrect as a matter of the evidence and law." The Board thus concluded that Sudzus was discharged for misconduct connected with work and was subject to disqualification of benefits under section 602(A) of the Illinois Unemployment Insurance Act (Act) (820 ILCS 405/602(A) (West 2006)). In turn, Sudzus sought judicial review of the Board's decision under the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2006)). The circuit court affirmed the decision of the Board and Sudzus now appeals.

## ANALYSIS

It is well settled that in an appeal from a decision denying unemployment compensation benefits, it is the duty of this court to review the decision of the Board rather than the circuit court. *Czajka v. Department of Employment Security*, 387 Ill. App. 3d 168, 172, 901 N.E.2d 436, 442 (2008); *Richardson Brothers v. Board of Review of Department of Employment Security*, 198 Ill. App. 3d 422, 428-29, 555 N.E.2d 1126, 1130 (1990). The scope of judicial review of an administrative agency's decision extends to all questions of law and fact presented in the record. 735 ILCS 5/3—110 (West 2006).

The standard of review applicable to the agency's decision depends on whether the question presented is one of fact, law, or a mixed question of law and fact. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204-05, 692 N.E.2d 295, 302 (1998). In reviewing the administrative agency's factual findings, a court does not weigh the evidence or substitute its judgment for that of the agency. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992); *City of Belvidere*, 181 Ill. 2d at 204, 692 N.E.2d at 302. The factual findings of an administrative agency are deemed *prima facia* true and correct; the reviewing court will determine if those findings are contrary to the manifest weight of the evidence. *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 513, 475 N.E.2d 879, 885 (1985). Factual determinations are only against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Abrahamson*, 153 Ill. 2d at 88, 606 N.E.2d at 1117. Alternatively, reviewing courts owe less deference to the administrative agency's conclusions of law, which are reviewed *de novo*. *International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security*, 215 Ill. 2d 37, 62, 828 N.E.2d 1104, 1119 (2005); *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254, 659 N.E.2d 961, 965 (1995). As such, an agency's decision on a question of law is not binding on a reviewing court. *City of Belvidere*, 181 Ill. 2d at 205, 691 N.E.2d at 302.

A third intermediate standard of review applies to an agency's determination involving mixed questions of law and fact.

"[A] mixed question is one in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or whether the rule of law as applied to the established facts is or is not violated." *Moss v. Department of Employment Security*, 357 Ill. App. 3d 980, 984, 830 N.E.2d 663, 667-68 (2005).

Mixed questions implicate the "clearly erroneous" standard, which is less deferential to the agency than the manifest weight of the evidence standard because the agency is deciding the legal application of a factual determination. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369, 776 N.E.2d 166, 177 (2002). We are mindful that, under such circumstances, our decision is based on fact-finding that is inseparable from the application of law to fact. *Chicago Messenger Service v. Jordan*, 356 Ill. App. 3d 101, 106, 825, N.E.2d 315, 320 (2005). An agency's decision will be deemed clearly erroneous only if, based on the entirety of the record, the reviewing court is left with the " 'definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393, 763 N.E.2d 272, 280-82 (2001), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

■■ We first address the claim that Butterfield, through its representative Larry Austin, participated in the unauthorized practice of law at the administrative hearing. We view this as a mixed question of law and fact, which we review under the clearly erroneous standard. Our inquiry of necessity begins with a recognition that the legislature has authorized lay representation of participants in proceedings before the Department. Thus, section 806 of the Act provides that "[a]ny individual or entity in any proceeding before the Director or his representative, or the Referee or the Board of Review, may be represented by a union or any duly authorized agent." 820 ILCS 405/806 (West 2006).

Notwithstanding this legislative grant of authority, our precedent makes clear that only licensed attorneys are entitled to practice law. 705 ILCS 205/1 (West 2006). "The General Assembly has no authority to grant a layman the right to practice law." *People ex rel. Chicago Bar Ass'n v. Goodman*, 366 Ill. 346, 352, 8 N.E.2d 941, 945 (1937), citing *In re Day*, 181 Ill. 73, 84, 54 N.E. 646, 648 (1899). Only the supreme court has the authority to "regulate and define the practice of law." *Goodman*, 366 Ill. at 349, 8 N.E.2d at 944.

Running through both contentions is an awareness that it is often difficult, if not impossible, to lay down a formula or definition of what constitutes the practice of law. *People ex rel. Illinois State Bar Ass'n v.*

*Schafer*, 404 Ill. 45, 50-51, 87 N.E.2d 773, 776 (1949). Hence, definition of the term "practice of law" defies mechanistic formulation. *In re Discipio*, 163 Ill. 2d 515, 523, 645 N.E.2d 906, 910 (1994). The touchstone for judging whether designated acts amounted to the practice of law was earlier expressed in *People ex rel. Illinois State Bar Ass'n v. Peoples Stock. Yards State Bank*, 344 Ill. 462, 475, 176 N.E. 901, 907 (1931):

> " 'Practicing as an attorney or counselor at law *** is the giving of advice or rendition of any sort of service by any person, firm or corporation when the giving of such advice or rendition of such service requires the use of any degree of legal knowledge or skill.' "

In *Goodman*, as in the case *sub judice*, the court's focus was upon representation of participants in administrative proceedings. Although respondent was not an attorney, he extensively engaged in the business of handling workmen's compensation claims. Respondent's activities routinely involved the solicitation of clients, providing advice concerning potential recoveries, negotiating settlements with insurance carriers, maintaining actions before the Industrial Commission and securing orders approving settlements. *Goodman*, 366 Ill. at 351-52, 8 N.E.2d at 944-45. Based upon these activities, our supreme court determined that respondent was indeed engaged in the practice of law. *Goodman*, 366 Ill. at 357, 8 N.E.2d at 944-45:

> "It is immaterial whether the acts which constitute the practice of law are done in an office, before a court or before an administrative body. The character of the act done, and not the place where it is committed, is the factor which is decisive of whether it constitutes the practice of law."

The *Goodman* court's rationale was rooted in the recognition that the legal ramifications of workmen's compensation practice were pervasive. As the court noted, practitioners should be able to weigh evidence and coordinate the testimony and its application to the statute. Moreover, the practice required a trained legal mind to intelligently grasp "the substantive provisions of (1) the Workmen's Compensation act, (2) the Federal Employer's Liability act and (3) the common law, as related to liability for damages for traumatic injuries." *Goodman*, 366 Ill. at 356, 8 N.E.2d at 946.

Conversely, in *Chicago Bar Ass'n v. Quinlan & Tyson, Inc.*, 34 Ill. 2d 116, 214 N.E.2d 771 (1966), our supreme court held that an individual who merely provides simple fact-based answers, which do not require legal skill or knowledge, has not engaged in the unauthorized practice of law. The *Quinlan* court determined that real estate brokers could fill in blanks on customary contract-of-sale forms or offers to purchase without engaging in the practice of law because these

documents "require no more than ordinary business intelligence and do not require the skill peculiar to one trained and experienced in the law." *Quinlan*, 34 Ill. 2d at 121, 214 N.E.2d at 774. However, the line was drawn by the court's understanding that upon execution of such contracts the broker has fully performed his obligation and could not fill in the blanks on deeds or mortgages and other legal instruments because those documents require the peculiar skill of a lawyer and constitute the practice of law. *Quinlan*, 34 Ill. 2d at 122, 214 N.E.2d at 774.

In *Perto v. Board of Review*, 274 Ill. App. 3d 485, 654 N.E.2d 232 (1995), as in the case *sub judice*, we were called upon to determine whether representation by a nonattorney before the Department of Employment Security constituted the practice of law. In *Perto*, the employer allowed its authorized agent to complete a protest form, which included a statement of facts detailing the claimant's discharge, and send a letter requesting a hearing before the Department. *Perto*, 274 Ill. App. 3d at 493-94, 654 N.E.2d at 238-39. No legal advice was provided. Because the mere submission of information did not require legal knowledge or skill, we concluded the acts of the nonattorney did not constitute the practice of law. *Perto*, 274 Ill. App. 3d at 494-95, 654 N.E.2d at 239.

In *Perto*, as distinguished from the case at bar, the employer's representative did not appear or participate in the administrative hearing. Significantly, however, the court relied in part on a decision of the Ohio Supreme Court in *Henize v. Giles*, 22 Ohio St. 3d 213, 218, 490 N.E.2d 585, 589 (1986), holding that the representation of an employer by an actuarial firm, through a nonattorney at a benefits hearing, did not constitute the unauthorized practice of law. While the nonattorney in *Henize* presented evidence for the employer, questioned witnesses, and performed the closing statement, the Ohio Supreme Court emphasized the relative simplicity and informality of the proceedings and the absence of any necessity for formal presentation of legal arguments. *Perto*, 274 Ill. App. 3d at 495, 654 N.E.2d at 240, citing *Henize*, 22 Ohio St. 3d at 216-17, 490 N.E.2d at 587-88.

Neither *Perto* nor any other Illinois precedent we have found provides insight into the scope of our enactment allowing nonattorneys' participation in hearings before the Department. However, we have previously looked for guidance from the Pennsylvania unemployment benefits statute, recognizing its similarity to our own. See *Popoff v. Department of Labor*, 144 Ill. App. 3d 575, 578, 494 N.E.2d 1266, 1268 (1986) (Illinois reviewing courts, having determined that the Pennsylvania unemployment statute is similar to the Illinois entitlement, have relied upon Pennsylvania *jurisprudence* in adjudicating

"voluntary leaving" under this section of the Act). Accordingly, we find instructive *Harkness v. Unemployment Compensation Board of Review*, 591 Pa. 543, 554, 920 A.2d 162, 169 (2007), which held that a nonattorney representing an employer at an unemployment hearing did not constitute the unauthorized practice of law. In *Harkness*, the Pennsylvania Supreme Court reasoned:

> "[T]he character of the activities performed by representatives at unemployment hearings coupled with the informal nature of these proceedings, the minimal amounts at issue, and the long history of participation by non-lawyer representatives suggest that the public does not need the protection that serves as the basis for classifying certain activities to constitute the practice of law." *Harkness*, 591 Pa. at 553-54, 920 A.2d at 168-69.

In the case *sub judice*, we likewise find that Larry Austin did not engage in the unauthorized practice of law by participating in the administrative hearing involving Butterfield, the employing unit. The Act establishes an informal hearing in which all parties, including the claimant and the employer, can participate without legal representation. 820 ILCS 405/806 (West 2006). We recognize that the provision affording parties the opportunity to be represented by a nonattorney is not unique to proceedings before the Department. As the assistant Attorney General offered at oral argument, the right to be represented by a party's lay representative or spokesman is also expressly authorized in administrative hearings before the Illinois Labor Relations Board (80 Ill. Adm. Code §1200.70, amended at 27 Ill. Reg. 7380, eff. May 1, 2003), the Illinois Educational Labor Relations Board (80 Ill. Adm. Code §1100.60), as well as the State Universities Retirement System (80 Ill. Adm. Code §1600.500(c)(5)).

Here, the regulations expressly required that Butterfield notify the Department of Sudzus' theft of parts from HVAC units while employed at the Industrial Kinetics jobsite. 56 Ill. Adm. Code §2720.132 (1997). Moreover, the claims adjudicator's subsequent investigation of Sudzus' eligibility required information gathering from Butterfield. 820 ILCS 405/702 (West 2006); 56 Ill. Adm. Code §2720.135 (1997).

From our review of the record, we discern that Austin was simply acting on behalf of Butterfield in a manner that would benefit the corporation; the character of the actions did not require legal knowledge or skill; and he supplied simple, fact-based answers. *Johnson v. Pistakee Highlands*, 72 Ill. App. 3d 402, 404, 390 N.E.2d 640, 642 (1979); *Goodman*, 366 Ill. at 357, 8 N.E.2d at 947; *Perto*, 274 Ill. App. 3d at 495, 654 N.E.2d at 239. Austin's participation in the hearing benefitted Butterfield because he was able to provide insight into

the duties of electricians on the Industrial Kinetics jobsite, the effects of dismantling and removing parts from an HVAC unit, and the approximate resulting damage. He also asked clarifying questions at the request of the referee. *Johnson*, 72 Ill. App. 3d at 404, 390 N.E.2d at 642 (holding a nonprofit did not perform acts which constituted the unauthorized practice of law when an employee prepared and filed legal documents which were solely for the benefit of the association). Moreover, Austin's actions are in stark contrast to those of the nonattorney in *Goodman* because Austin did not provide legal opinions or advice nor did his answers or questions within the hearing require any legal knowledge or skill. *Goodman*, 366 Ill. at 357, 8 N.E.2d at 947. From the totality of the circumstances, we are unable to discern that Austin's limited representation of Butterfield constituted the unauthorized practice of law.

We next address Sudzus' claim that he was denied a full and fair opportunity to be heard in conformance with the fundamental requirements of due process of the law. As we perceive this issue to present a question of law, our review is under the *de novo* standard. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 271, 807 N.E.2d 423, 430 (2004). "[A]n administrative proceeding is governed by the fundamental principles and requirements of due process of law. However, due process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand." *Abrahamson*, 153 Ill. 2d at 92, 606 N.E.2d at 1119.

It is well-settled that a fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence. *Abrahamson*, 153 Ill. 2d at 95, 606 N.E.2d at 1120. In *Abrahamson*, the applicant's due process claim stemmed, in part, from remarks made by an Illinois Medical Licensing Board member and the Board's attorney during the administrative hearing that challenged the applicant's veracity. Although the court agreed that the remarks were irrelevant, it concluded the hearing nonetheless afforded the applicant due process. *Abrahamson*, 153 Ill. 2d at 95, 606 N.E.2d at 1120. Moreover, as the court reasoned, absent a " 'showing to the contrary, State administrators "are assumed to be men of conscience *** capable of judging a particular controversy fairly on the basis of its own circumstances." [Citations.]' [Citation.]" *Abrahamson*, 153 Ill. 2d at 95, 606 N.E.2d at 1120.

The regulations governing IDES' administrative hearings allow the referees oversight provided it does not infringe on due process rights. Pursuant to the regulations, "The Referee will control the

hearing which will be confined to the factual and/or legal issues on appeal and ensure that the parties have a full opportunity to present all evidence and testimony regarding such issue[s]." 56 Ill. Adm. Code §2720.245(a) (1997). Additionally, the regulations stipulate that, the Referee shall continue in a hearing even if introduced or referenced documents were not received as long as the reasons admitting or not admitting documents are stated in the record. 56 Ill. Adm. Code §2720.215(c) (1997). The IDES interpretation of these regulations and the resultant practices are entitled to deference by the reviewing court. *See Abrahamson*, 153 Ill. 2d at 98, 606 N.E.2d at 1121.

We further discern that a claim of a due process violation will be sustained only upon a showing of prejudice in the proceeding. *Booker v. Department of Employment Security*, 216 Ill. App. 3d 320, 322, 576 N.E.2d 1028, 1030 (1991). In *Booker*, the plaintiff argued that he was denied due process because the transcript of the administrative hearing contained inaudible portions and "some documents submitted to the hearing examiner [were] not contained in the record." *Booker*, 216 Ill. App. 3d at 322, 576 N.E.2d at 1030. However, without a showing of prejudice, the court found no basis for the plaintiff's claim of a denial of due process. *Booker*, 216 Ill. App. 3d at 322, 576 N.E.2d at 1030.

■ In the case at hand, we likewise find Sudzus has not made a sufficient showing of a due process denial by the conduct of his hearing. During the hearing, Sudzus was afforded a full opportunity to present testimony as to his understanding that the HVAC units at Industrial Kinetics could be dismantled, that he and other individuals dismantled HVAC units, and that he had never been properly informed of being fired from Butterfield. Although Sudzus' testimony was not consistent on all of these matters, the hearing nonetheless provided him with an opportunity to be heard in compliance with due process. *Abrahamson*, 153 Ill. 2d at 95, 606 N.E.2d at 1120. Additionally, the referee provided Sudzus with the opportunity to question other witnesses. Sudzus put no questions to Austin or Manley, but did indeed question Crocilla. Due process was not denied merely because Sudzus did not fully exercise his right to cross-examination. See *Abrahamson*, 153 Ill. 2d at 95, 606 N.E.2d at 1120. Additionally, Sudzus makes no claim that the referee made a biased determination on the evidence in violation of due process. *Abrahamson*, 153 Ill. 2d at 95, 606 N.E.2d at 1120. Finally, Sudzus' contention that not allowing closing arguments constituted a denial of due process has no support in the law or regulations.

In the instant proceedings, the referee had the discretion to control the hearing in the best manner for the circumstances. 56 Ill. Adm. Code §2720.245(a) (1997). Notably, during the hearing, the referee al-

lowed the parties to make clarifying statements while other witnesses testified and continued the hearing although she had not received Sudzus' time line. 56 Ill. Adm. Code §§2720.215(c), 2720.245(a) (1997). Overall, we perceive that Sudzus received an administrative hearing in compliance with due process where he had the opportunity to be heard through his testimony, had the right to cross-examine Austin, Manley, and Crocilla, and obtained impartial rulings on the evidence. The referee exercised appropriate control as regards the form of witness testimony and questions, and the treatment of Sudzus' time line, the referenced documents. 56 Ill. Adm. Code §§2720.215(c), 2720.245(a) (1997). We therefore conclude that the administrative hearing met the due process requirements and provided Sudzus with a full and fair opportunity to be heard. *Abrahamson*, 153 Ill. 2d at 92, 606 N.E.2d at 1119.

■ Lastly, we consider whether the Board erred in its determination that Sudzus committed statutory misconduct. If an individual is discharged for misconduct, he is ineligible to receive unemployment benefits under the Act. *Livingston v. Department of Employment Security*, 375 Ill. App. 3d 710, 716, 873 N.E.2d 444, 457 (2007). The question of whether an employee was properly terminated for misconduct in connection with his work involves a mixed question of law and fact, to which we likewise apply the clearly erroneous standard of review. *Oleszczuk v. Department of Employment Security*, 336 Ill. App. 3d 46, 50, 782 N.E.2d 808, 811 (2002). To establish statutory misconduct, the Board must determine whether: (1) there was a deliberate and willful violation of a rule or policy; (2) the rule or policy of the employing unit was reasonable; and (3) the violation either had harmed the employer or was repeated by the employee despite previous warnings. See 820 ILCS 405/602(A) (West 2006).

■ Addressing the first criterion, the focus is on whether Sudzus deliberately and willfully violated a rule. "An employee's act of misconduct is willful if he is aware of a company rule and then disregards that rule." *Caterpillar, Inc. v. Department of Employment Security*, 313 Ill. App. 3d 645, 653, 730 N.E.2d 497, 504 (2000). In the administrative hearing, the Board determined that Sudzus admitted dismantling of HVAC units from the rooftop at the Industrial Kinetics jobsite. Manley, the superintendent of Five Star Mechanical, testified that he told Sudzus that two of the HVAC units could not be dismantled. Consequently, the Board did not err in finding that Sudzus willfully and deliberately violated a rule by dismantling and removing parts from the units notwithstanding a warning that two units were to remain intact.

The second element of misconduct under the Act requires a showing that the rule or policy of the employing unit was reasonable. A reasonable rule concerns " 'standards of behavior which an employer has a right to expect' " from an employee. *Livingston*, 375 Ill. App. 3d at 716, 873 N.E.2d at 457, quoting *Bandemer v. Department of Employment Security*, 204 Ill. App. 3d 192, 195, 562 N.E.2d 6, 7 (1990). However, a rule or policy need not be written down or otherwise formalized. *Czajka*, 387 Ill. App. 3d at 177, 901 N.E.2d at 445; *Caterpillar*, 313 Ill. App. 3d at 654, 730 N.E.2d at 505. Even without direct evidence, the reviewing court may make a "commonsense realization that certain conduct intentionally and substantially disregards an employer's interest." *Greenlaw v. Department of Employment Security*, 299 Ill. App. 3d 446, 448, 701 N.E.2d 175, 178 (1998).

Nevertheless, in order for a rule to be reasonable, the rule must appropriately relate to the workplace. 820 ILCS 405/602(A) (West 2006); *Livingston*, 375 Ill. App. 3d at 719, 873 N.E.2d at 453; *Czajka*, 387 Ill. App. 3d at 176, 901 N.E.2d at 447. In *Livingston*, we found that a nursing home's policy prohibiting employees from slapping or touching the faces of the residents was a reasonable rule as it pertained to the workplace and was part of the employee's job performance. *Livingston*, 375 Ill. App. 3d at 719, 873 N.E.2d at 453. Also, in *Czajka*, there was a nexus between the duties of a church sacristan and her protest to a parish program and policies. *Czajka*, 387 Ill. App. 3d at 178, 901 N.E.2d at 447.

In the case at hand, Butterfield had a reasonable rule and expectation that its electricians would not be on the roof of Industrial Kinetics as there was no work to be done there nor would they dismantle and remove parts from any of the HVAC units. Both Austin and Crocilla testified to the fact that Butterfield electricians had no business on the roof at the time Manley witnessed Sudzus dismantling a HVAC unit. Although the policy was not written down, we can make a "commonsense" determination that Butterfield's electricians were not authorized to dismantle any units as that was clearly the function of a different company. Furthermore, a nexus exists between Sudzus' actions and his employment because the dismantling of units occurred during work hours at the Industrial Kinetics jobsite. *Livingston*, 375 Ill. App. 3d at 719, 873 N.E.2d at 453; *Czajka*, 387 Ill. App. 3d at 176, 901 N.E.2d at 447. Therefore, the rule or policy of Butterfield prohibiting electricians from being on the roof and dismantling HVAC units was a reasonable rule within section 602(A) of the Act.

The final element to establish misconduct under the Act requires that either the violation caused harm to the employer or the employee repeated an action despite a warning by the employer. Here, Sudzus

received a prior warning from Manley not to dismantle two HVAC units. Additionally, dismantling of HVAC units caused harm to Butterfield because of the financial obligation to repair the damage.

■ Sudzus further asserts that the evidence regarding the approximate cost of physical damage raises issues of hearsay. " 'Generally, hearsay evidence is not admissible in an administrative proceeding. [Citation.] However, where there is sufficient competent evidence to support an administrative decision, the improper admission of hearsay testimony in the administrative proceeding is not prejudicial error.' " *Abrahamson*, 153 Ill. 2d at 94, 606 N.E.2d at 1120, quoting *Goranson v. Department of Registration & Education*, 92 Ill. App. 3d 496, 501, 415 N.E.2d 1249, 1253 (1980). However, a statement made out of court which is offered "for a purpose other than to prove the truth of the matter asserted in a statement is not 'hearsay.' " *People v. Williams*, 181 Ill. 2d 297, 313, 692 N.E.2d 1109, 1118 (1998).

Here, Austin testified that the Butterfield customer "ball parked" the damage at "around $8,000." Although this statement is facially hearsay, the purpose of Austin's testimony was not to prove that the cost of the damages actually amounted to $8,000 but merely to alert the Board that the damage to the HVAC units resulted in a potential monetary loss. *Williams*, 181 Ill. 2d at 312, 692 N.E.2d at 1118. Manley testified that all of the HVAC units on the roof of Industrial Kinetics were dismantled. The hearsay evidence of the customer's approximation of damages was admissible because its purpose was to establish harm rather than to prove the truth of the matter asserted and supports the notion that harm in the form of financial responsibility resulted from the dismantling of units. *Williams*, 181 Ill. 2d at 312-13, 692 N.E.2d at 1118; *Abrahamson*, 153 Ill. 2d at 94, 606 N.E.2d at 1120.

## CONCLUSION

For the foregoing reasons, we find that Sudzus has failed to demonstrate that the Board's decision regarding the unauthorized practice of law or the denial of unemployment benefits was clearly erroneous. We likewise find that the conduct of the administrative hearing comported with the standards of procedural due process. Accordingly, we affirm the judgment of the circuit court upholding the decision of the Board.

Affirmed.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.